| | |
|---|---|
| DISTRICT COURT, ADAMS COUNTY, COLORADO<br>Adams County Justice Center<br>1100 Judicial Center Drive<br>Brighton, Colorado  80601 | DATE FILED: January 24, 2013 4:31 PM<br>FILING ID: 9EB32325 |
| **Plaintiff:**<br>Carolyn K. Harner<br><br>v.<br><br>**Defendants:**<br>Adams County and its Board of County Commissioners;<br>and James Hibbard | ▲COURT USE ONLY ▲ |
| **Attorneys for Plaintiff:**<br>Baine P. Kerr, No. 9797<br>Keith M. Edwards, No. 42666<br>Hutchinson Black and Cook, LLC<br>921 Walnut Street, Suite 200<br>Boulder, CO  80302<br>Phone: (303) 442-6514<br>Fax: (303) 442-6593<br>kerr@hbcboulder.com<br>kedwards@hbcboulder.com | Case Number:<br>Courtroom/Division: |
| **COMPLAINT** | |

Plaintiff Carolyn K. Harner ("Ms. Harner" or "Plaintiff"), for her Complaint against Defendants Adams County and its Board of County Commissioners, and James Hibbard ("Coroner Hibbard"), states as follow:

## PARTIES AND VENUE

1.      Plaintiff Carolyn Harner is a resident of Broomfield County, Colorado, and is the widow of Michael Lynn Harner, D.D.S. ("Dr. Harner").

2.      Defendant Adams County Board of County Commissioners is the elected governing board of Adams County, Colorado, and was the employer of Coroner Hibbard, who was elected to that office by the voters of Adams County.

3.      Coroner Hibbard was the coroner of Adams County until January 11, 2011.  The acts and omissions complained of herein occurred during his tenure in office and were within the scope of his employment by Adams County.

4.      The acts and omissions complained of herein occurred in Adams County, Colorado, where jurisdiction and venue are therefore proper under C.R.S. § 13-1-124 and C.R.C.P. 98(c).

## GENERAL ALLEGATIONS
### (Incorporated in All Claims For Relief)

5.      On June 7, 2007, Dr. Harner and Ms. Harner went to the Emergency Department of Boulder Community Hospital because Dr. Harner was experiencing chest pain.

6.      At Boulder Community Hospital, Dr. Harner was evaluated for cardiac function and given a diagnostic angiogram by cardiologist James Chapman, M.D.

7.      In the course of the angiogram, but unrecognized by Dr. Harner, who was heavily sedated, or by Dr. Chapman and his team, at approximately 3:00 p.m. Dr. Chapman negligently perforated Dr. Harner's aorta near the top of the arch with cardiac catheterization equipment.

8.      The perforation produced a slow, pressurized bleed from the hole in Dr. Harner's artery into surrounding tissue and his chest cavity.

9.      Approximately three hours after the angiogram and perforation, Dr. Harner was discharged from Boulder Community Hospital.  However, approximately fifty minutes later, while being driven to their house by Ms. Harner, he collapsed and arrested.

10.     Emergency personnel transported Dr. Harner to the Exempla Good Samaritan Hospital Emergency Department, but he expired and was pronounced dead at 7:34 p.m.

11.     Ms. Harner, in the hours after her husband's death, decided to forego burial and funeral services then and not object to the release of Dr. Harner's body to the Adams County Coroner's Office ("ACCO") for an autopsy to determine the cause of Dr. Harner's death.

12.     Coroner Hibbard's and ACCO's compensation, funding, and re-election depended on the competent performance of autopsies and the proper preservation of physical remains. They accepted delivery and custody of Dr. Harner's body in furtherance of these objectives.

13.     Dr. Harner's body was delivered from the Exempla Good Samaritan morgue to ACCO where an autopsy was performed five days later on June 12, 2007.

14.     The autopsy was performed by board-certified forensic pathologist Michael Arnall, M.D. ("Dr. Arnall"), assisted by pathology lab supervisor Monica Broncucia-Jordan ("Ms. Jordan").

15.     Ms. Jordan is the current Adams County Coroner, having succeeded Coroner Hibbard in office on January 11, 2011.

16.     During the autopsy, Dr. Arnall and Ms. Jordan found approximately 1.5 liters of blood that had accumulated in Dr. Harner's left chest cavity in the mediastinum and left pleural space. The blood tracked up to a mechanical hole in the arch of Dr. Harner's aortic artery that matched the < 1 mm diameter of the stainless steel guidewire used by Dr. Chapman in the angiogram.

17.     Dr. Arnall determined and certified the cause of Dr. Harner's death as "hemothorax due to perforation of aortic arch due to cardiac catheterization."

18.     Dr. Arnall carefully removed the section of aorta with the < 1 mm hole and instructed Ms. Jordan to save, store, and preserve it as it would likely be critical evidence in foreseeable medical malpractice litigation that was likely to be filed over Dr. Harner's death.

19.     Ms. Jordan placed the section of aorta in a container of formalin, sealed it, and marked it "HOLD," with information identifying it by Dr. Harner's name and autopsy number.

20.     Ms. Jordan placed the container with Dr. Harner's aorta specimen on the "hold shelf" in the locked Specimen Room at the ACCO.

21.     Under procedures and policies in place throughout Coroner Hibbard's tenure, routine tissue specimens were destroyed six months after autopsy, except that, by agreement with prosecutors, law enforcement, civil attorneys or parties, or others, tissue specimens needed for civil or criminal litigation were carefully preserved on the hold shelf in the Specimen Room until needed in litigation.

22.     From the day of the Harner autopsy until her departure in April 2009 from ACCO, Ms. Jordan was in charge of both the six-month routine destruction of tissue and the preservation of tissue specimens for evidence on the hold shelf.

23.     The Specimen Room had a numbered punch-code lock, the code to which was known only to limited personnel at ACCO, including Ms. Jordan and Coroner Hibbard. The Specimen Room was kept locked at all times when ACCO personnel were not using it.

24.     The Harner aorta specimen remained on the hold shelf with 15 to 20 other sealed and marked specimens being preserved as evidence in homicide, rape, or civil cases.

25.     Neither Ms. Jordan nor anyone else subjected the Harner aorta specimen to routine six-month destruction as ACCO records conclusively show.

26.     From June 2007 until she left ACCO in April 2009, Ms. Jordan periodically inventoried the hold shelf in the Specimen Room to ensure that all tissue specimens, including the Harner aorta specimen, being held for litigation remained preserved, in place, and secure.

27.     In November 2008, Ms. Harner's representatives notified Defendants that a wrongful death lawsuit was anticipated and that all potential evidence at ACCO should be preserved and secured, which Defendants agreed to do.

28.     In November 2008, Mr. Harner's counsel met with Dr. Arnall at ACCO and discussed the autopsy and need to preserve tissue specimens.

29.     On November 28, 2008, Ms. Harner's paralegal called to request Defendants to produce the entire autopsy file and to preserve tissue specimens. Defendants agreed and required a fee to comply with the request, which was paid.

30.     Defendants provided portions of the autopsy file to Ms. Harner's lawyers and assured them that tissue specimens would be preserved.

31.     Coroner Hibbard terminated Dr. Arnall as Adams County's forensic pathologist in December 2008, and Ms. Jordan as an ACCO employee in April 2009.

32.     In April 2009, on her last day as an ACCO employee, close to two years after Dr. Harner's death, Ms. Jordan inventoried the hold shelf again and confirmed that the Harner specimen remained preserved, in place, and secure.

33.     Shortly after Ms. Jordan's departure, Coroner Hibbard was contacted by the law firm representing Dr. Chapman, also requesting that ACCO and Coroner Hibbard ensure that the contents of Dr. Harner's autopsy file and all tissue from the autopsy be preserved as potentially key evidence in the anticipated litigation.

34.     Coroner Hibbard agreed also to this request to preserve, safeguard, and retain all tissue specimens and other evidence from the Harner autopsy as evidence in the coming litigation.

35.     Coroner Hibbard and ACCO were not then under a legal regulatory duty to preserve autopsy tissue beyond six months, but agreed to continue to preserve all Harner tissue specimens in response to counsels' requests and the agreements.

36.     On September 4, 2009, a wrongful death suit was filed by Ms. Harner against Dr. Chapman as Dr. Arnall and Ms. Jordan had anticipated, and as Defendants had been told would occur.

37.     Before and during the lawsuit, Defendants were sent requests for production of Dr. Harner's autopsy file and tissue specimens. Before responding, Defendants required that they be paid fees.

38.     ACCO and Coroner Hibbard produced portions of the autopsy file and some tissue slides, but did not produce the aorta specimen, even though it remained in a container on the hold shelf where Ms. Jordan had secured it.

39.     On September 24, 2009, Ms. Harner's paralegal left a voicemail for Coroner Hibbard emphasizing the importance of preserving tissue specimens, and asking how they were being preserved since a joint tissue analysis by Ms. Harner's expert, Michael Dobersen, M.D., and Dr. Chapman's expert, Robert Bux, M.D., was planned.

40.     In December 2009, arrangements were made to proceed with joint analysis of the aorta tissue specimen by Dr. Dobersen and Dr. Bux.

41.     Coroner Hibbard told both sides in the lawsuit that there were no preserved tissue specimens to analyze, which was not true.  The joint analysis therefore did not take place.

42.     At various times during the course of the lawsuit, the attorney for Dr. Chapman remarked that if the aorta specimen with the perforation could be produced and showed that Dr. Chapman had perforated the aorta, he and his malpractice carrier would settle Ms. Harner's claims.

43.     At the eventual trial of the case, the attorney for Dr. Chapman several times again said and told the jury that, if there were direct physical evidence of the perforation of the aorta, "we would not even be here."

44.     Dr. Harner's remains were and are Ms. Harner's personal property.

45.     Ms. Harner was the owner of her husband's physical remains which she entrusted to the ACCO and to Coroner Hibbard.

46.     Ms. Harner agreed to the delivery of her husband's remains to ACCO and Coroner Hibbard for the purpose of the autopsy and the safekeeping of tissue therefrom.

47.     Ms. Harner's agreement that an autopsy could be performed on her husband, and ACCO's and Coroner Hibbard agreeing to perform the autopsy, constituted an express and implied contract that tissue from the autopsy be preserved, accounted for, and ultimately returned intact to Ms. Harner.

48.     By accepting from Ms. Harner Dr. Harner's physical remains, ACCO and Coroner Hibbard promised to safeguard them, including the aorta tissue specimen.

49.     Defendants had exclusive physical control over Dr. Harner's remains while in their custody.

50.     Coroner Hibbard and ACCO in 2009 and thereafter promised Ms. Harner's representatives that all tissue specimens and slides from the Harner autopsy would be safeguarded and preserved for purposes of litigation.

51.     Safeguarding the tissue specimens benefited Defendants in pursuing their business and governmental functions and operations.

52.     Coroner Hibbard and ACCO benefited from agreeing to perform the autopsy and promising to safeguard the tissue for litigation through the financial and potentially electoral rewards of demonstrating the effective and proper operations of an office committed to the scientific mission of determining causes of death, and by the collection of fees from Ms. Harner and Dr. Chapman.

53.     Defendants held themselves out as skilled and capable in safeguarding Dr. Harner's remains and tissue specimens. Therefore, and because Ms. Harner had no access to her property maintained at ACCO, Defendants had greater than ordinary obligations to safeguard it.

54.     Ms. Harner's agreement to deliver her husband's body for autopsy deprived her to her detriment of the opportunity for an immediate burial and funeral and the emotional closure that would have provided.

55.     Coroner Hibbard and ACCO never communicated to Ms. Harner that they might be unable to fulfill their obligations to preserve the aorta specimen.

56.     Ms. Harner relied to her detriment on ACCO and Coroner Hibbard to preserve the aorta specimen for litigation as, had she known the aorta specimen would not be completely protected, she could have found other means to safeguard it for trial.

57.     On November 22, 2010, Ms. Harner's counsel called ACCO to again ask if the Harner aorta specimen might be located. The receptionist relayed the inquiry to ACCO staff and, after several minutes, reported that Harner tissue specimens had been located and the container was being preserved for the litigation.

58.     Attorneys for both sides again conferred to arrange for a joint inspection of the tissue specimens, but, on November 25, 2010, Coroner Hibbard informed Ms. Harner's counsel and others by e-mail that his receptionist had been mistaken and that the container of Harner tissue specimens could not be found.

59.     Earlier that month, Ms. Jordan had been elected Adams County Coroner, replacing Coroner Hibbard who did not run for re-election. Ms. Jordan did not take office, or have any access to ACCO, however, until January 11, 2011.

60.     After Ms. Jordan assumed office at ACCO, as trial in *Harner v. Chapman* was about to begin in three weeks, counsel for Ms. Harner contacted new Coroner Jordan to ask if her staff could double-check to see if the aorta specimen could be found.

61.     On January 26, 2011, Coroner Jordan telephoned Ms. Harner's counsel to say that the aorta specimen had been destroyed, and that computer records showed that the destruction occurred November 29, 2010.

62.     The Harner aorta specimen was ordered destroyed on November 29, 2010, by Coroner Hibbard, four days *after* he falsely informed Ms. Harner's representatives and others that it could not be located and did not exist.

63.     Coroner Hibbard ordered the tissue specimens destroyed with knowledge of or deliberate indifference to the extreme prejudice it would cause to Ms. Harner's ongoing litigation.

64.     After a seven day jury trial in July 2011, the jury rendered a verdict in Dr. Chapman's favor.

65.     If Ms. Harner had been able to present the aorta specimen with the perforation to the jury and to Dr. Chapman, not only would there not have been a defense verdict, on information and belief, the case would have settled long before trial for close to the $1 million policy limits and without the time and expense of lengthy litigation.

66.     As a direct consequence of Coroner Hibbard's and Adams County's breaches of their promises, obligations, and agreements to preserve the aorta specimen by causing or allowing the aorta specimen to be destroyed when it foreseeably was critical to medical malpractice litigation, and as a result of Coroner Hibbard's violations of her civil rights, Ms. Harner suffered injuries, damages, and losses, including the defense verdict; a cost award of greater than $100,000; the loss of a significant settlement; a $120,000 supersedeas bond; and the substantial costs and expenses of litigation and appeal, including the time value of her attorney's fees, as well as the substantial emotional distress attending the loss of her husband's body part, the damage to her claims, and the burdens of protracted litigation.

67.     The injuries, damages and losses set forth in paragraph 65 immediately above were natural, probable and reasonably foreseeable consequences of Defendants' acts and omissions, and were within the contemplation of the parties.

## FIRST CLAIM FOR RELIEF
### (Bailment)

68.     Dr. Harner's remains became the personal property of Ms. Harner on his death.

69.     Ms. Harner agreed to the delivery of Dr. Harner's remains to ACCO and Coroner Hibbard for the special purposes of performing an autopsy to determine cause of death and safeguarding tissue specimens if litigation could be anticipated.

70.     Ms. Harner agreed to the delivery of Dr. Harner's remains and tissue specimens to ACCO and Coroner Hibbard with the understanding that they would be returned to her when the purposes were accomplished.

71.     ACCO and Coroner Hibbard agreed to accept and safeguard Dr. Harner's remains and tissue specimens for use in litigation over Dr. Harner's wrongful death.

72.     The bailment was for the mutual benefit of Ms. Harner as bailor and ACCO and Coroner Hibbard as bailees, and at a minimum for the benefit of Ms. Harner as bailor.

73.     Defendant bailees failed to fulfill their contractual, statutory, and legal duties to preserve and secure the personal property without damaging, destroying, or losing it.

74.     Defendant baileees are presumed to have breached and violated their obligations and duties by failing to preserve and return the personal property.

75.     Defendants are liable to Plaintiff for her general, special, and consequential damages caused by their failures to preserve and return the personal property to Plaintiff, as set forth in paragraph 65 above.

## SECOND CLAIM FOR RELIEF
### (Promissory Estoppel)

76.     ACCO and Coroner Hibbard expressly and impliedly promised to safeguard Dr. Harner's physical remains at the ACCO.

77.     ACCO and Coroner Hibbard should reasonably have expected this promise to induce action or forbearance on the part of Ms. Harner.

78.     Ms. Harner relied on Coroner Hibbard and ACCO to safeguard her husband's physical remains, including the aorta tissue specimen.

79.     Ms. Harner's reliance was to her detriment as she could have ensured that the aorta tissue specimen remained preserved by other means in another bailment.

80.     ACCO and Coroner Hibbard breached their promises to safeguard, preserve, and secure the aorta tissue specimen, allowing or causing it to be destroyed on November 29, 2010, after having promised to preserve it.

81.     As a consequence, Ms. Harner suffered the injuries, damages, and losses set forth in paragraph 65 above.

## THIRD CLAIM FOR RELIEF
### (Violation of Rights of Access to the Courts Under 42 U.S.C. § 1983)

82.     Ms. Harner had fundamental rights of access to the courts to pursue wrongful death civil claims which were protected by the United States Constitution.

83.     At the time of Defendants' conduct, Ms. Harner's rights of access to the courts were clearly established as reasonable persons in Defendants' positions would have known.

84.     Ms. Harner's ability to litigate, settle, and prevail in her wrongful death claims were severely damaged, obstructed, and precluded by Defendants' acts and omissions, under color of state law, in failing to safeguard and in destroying evidence critical to proving her claims.

85.     Coroner Hibbard's conduct shocks the conscience.

86.     Coroner Hibbard's intentional and deliberate destruction of Dr. Harner's tissue specimen violated Ms. Harner's fundamental constitutional rights, causing injuries, damages, and losses set forth in paragraph 65 above.

WHEREFORE, Plaintiff prays for an award in amounts to be determined at trial of her damages, fees, costs, attorney's fees, attorney's fees under 42 U.S.C. § 1981, statutory interest from the date the claims arose, and such other and further relief as the Court deems proper.

## JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY OF SIX ON ALL ISSUES TRIABLE.

DATED:  January 23, 2013

Respectfully submitted,

*HUTCHINSON BLACK AND COOK, LLC*
*Original signature maintained at the offices*
*of Hutchinson Black and Cook LLC.*

By: _s/ Baine P. Kerr_
      Baine P. Kerr

ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:

4003 Centennial Drive
Broomfield, CO 80020